```
                                        ┌─────────────────────────────┐
                                        │ USDC SDNY                   │
                                        │ DOCUMENT                    │
UNITED STATES DISTRICT COURT            │ ELECTRONICALLY FILED        │
SOUTHERN DISTRICT OF NEW YORK           │ DOC #:                      │
- - - - - - - - - - - - - - - - - -x    │ DATE FILED: 8|23|07         │
                                        └─────────────────────────────┘
DARREN LEWIS,                         :

                    Plaintiff,        :          **OPINION**

            - against -               :          06 Civ. 4909 (DC)

NORTH GENERAL HOSPITAL and            :
1199SEIU UNITED HEALTH CARE
WORKERS EAST,                         :

                    Defendants.       :

- - - - - - - - - - - - - - - - - -x
```

**APPEARANCES:**    DARREN LEWIS
                    Plaintiff Pro Se
                    1370 Virginia Avenue, No. 4D
                    Bronx, NY  10462

                    ROSENBLUTH & ROSENBLUTH
                    Attorneys for Defendant North General Hospital
                         By:  Thomas S. Rosenthal, Esq.
                    11 Broadway, Suite 2150
                    New York, NY  10004

                    LEVY RATNER, P.C.
                    Attorneys for Defendant 1199SEIU United Health
                      Care Workers East
                         By:  Allyson L. Belovin, Esq.
                    80 Eighth Avenue, 8th Floor
                    New York, NY  10011-5126

**CHIN, D.J.**

        In this employment discrimination case, plaintiff
Darren Lewis, proceeding pro se, sues his former employer,
defendant North General Hospital (the "Hospital"), and his former
union, defendant 1199SEIU United Health Care Workers East (the
"Union").  Lewis contends that the Hospital discriminated and
retaliated against him, breached contracts with him, and defamed
him.  He contends that the Union breached its duty of fair

representation by failing to represent him in grievance
proceedings and by declining to arbitrate his grievance.

Defendants move for summary judgment.  For the reasons
that follow, the motion is granted and the complaint is dismissed
in all respects.

## STATEMENT OF THE CASE

**A.**   **The Facts**

For purposes of these motions, the facts are construed
in the light most favorable to plaintiff as the party opposing
summary judgment, and conflicts in the evidence have been
resolved in his favor.

### 1.   **The Parties**

Lewis is a gay African American man.  (Pl. 4/10/07
Decl. ¶ 31; <u>see</u> Pl. H56.1 at 4, 5).[1]  He is not Muslim.  (Pl.
H56.1 at 25).  He has been diagnosed in the past with post
traumatic stress disorder, obsessive compulsive disorder, and
major depression.  (<u>Id.</u> at 2).  He received a Masters in Social

---

[1]    "Pl. 4/10/07 Decl." refers to Lewis's declaration dated
April 10, 2007, submitted in opposition to the Hospital's motion.
"Pl. H56.1" refers to Lewis's response to the Hospital's Rule
56.1 statement of undisputed facts.  "Union 56.1" refers to the
Union's Rule 56.1 statement.  "Pl. 56.1" refers to Lewis's
response to the Union's 56.1 statement, which is numbered "33" on
the first page.  "Pl. Dep." refers to the transcript of Lewis's
deposition.  "UX," "HX," and "PX" refer, respectively, to the
Union's, the Hospital's, and plaintiff's exhibits submitted in
support of and in opposition to defendants' motions for summary
judgment.  "Pl. Resp. to Hosp. Mem." refers to plaintiff's
response to the Hospital's memorandum of law.  Plaintiff's
documents and exhibits are not clearly numbered and hence I have
numbered the pages and exhibits consecutively and refer to them
by these numbers.

Work from Columbia.  (<u>Id.</u> at 4).  He was employed as a social worker by the Hospital from November 29, 2004 until January 18, 2006.  (Union 56.1 ¶ 1; Pl. U56.1 ¶ 1; Pl. Dep. 7).  During the period immediately preceding and during his employment at the Hospital, Lewis's legal name was Serh Talmadge Farid Efe.  (Union 56.1 ¶ 2; Pl. U56.1 ¶ 2; <u>see</u> UXs 1, 2, 3; Pl. Dep. 5).  On January 20, 2006, Lewis legally reverted to his birth name, Darren Lewis.  (Union 56.1 ¶ 3; Pl. U56.1 ¶ 3; UXs 4, 5).

While employed at the Hospital, Lewis was a member of the Union.  (Union 56.1 ¶ 4; Pl. U56.1 ¶ 4).  The Union is a labor organization within the meaning of § 2(5) of the Labor Management Relations Act (the "LMRA"), 29 U.S.C. § 152(5), and it is the certified collective bargaining representative of certain employees of the Hospital, which is an employer covered by the LMRA.  (Union 56.1 ¶¶ 5, 6; Pl. 56.1 ¶¶ 5, 6).  The Hospital is a member of the League of Voluntary Hospitals (the "League"), a multi-employer association, and the Hospital was bound by a collective bargaining agreement (the "CBA") between the League and the Union covering the period of Lewis's employment at the Hospital.  (Union 56.1 ¶¶ 7-10; Pl. 56.1 ¶¶ 7-10).  The CBA permitted the Hospital to discharge employees for cause.  (Union 56.1 ¶ 11; Pl. 56.1 ¶ 11).

    2.   **<u>Lewis Is Hired By The Hospital</u>**

On November 16, 2004, the Hospital extended Lewis a written offer of employment as a "Social Worker" in its HIV/AIDS Special Services Department effective November 29, 2004.  (UX 1;

Case 1:06-cv-04909-DC   Document 45   Filed 08/23/07   Page 4 of 39

see Pl. Dep. 16, 18 (Lewis acknowledging he was hired as a "social worker")).  The offer letter, which was signed by Lewis (under his then-name of "Serh Efe"), stated that the offer was "contingent" upon, inter alia, "professional credentialing."  (UX 1).  The Hospital's job description for the Social Worker position described the qualifications as "[a] Master's in Social Work from an accredited graduate school of social work with NYS licensure required within one year from date of hire."  (UX 28; see Pl. Dep. 21).  The Hospital's posting for the job vacancy that Lewis filled also noted that "NYS Licensure [was] required within one year from date of hire."  (HX 6 at 2; see Pl. Dep. 38-40).

On November 22, 2004, approximately eight days before he commenced his employment with the Hospital, Lewis signed a form entitled "Outstanding New Hire Documentation," in which he stated:

> I understand that my employment can be terminated for cause if the following document(s) ___CSW/LMSW___ is not furnished by ___11-30-05___.

(UX 10).  The reference to "CSW/LMSW" was to the titles "Certified Social Worker" and "Licensed Master Social Worker,"[2]

---

[2]     Generally, social workers -- formerly known as "certified social workers" -- must be licensed under New York law.  See N.Y. Education Law §§ 7702, 7704 (McKinney Supp. 2007). Effective September 1, 2004, the term "certified social worker" was replaced by the title "licensed master social worker."  See id. § 7702 & historical note.  A new title, "licensed clinical social worker," was also added.  See id.  (See also HX 7). Section 7702(2) of the Education Law provides that "[o]nly a person licensed or exempt under this article shall practice 'licensed master social work' as defined in subdivision one of

- 4 -

and it was understood that Lewis would have to obtain his license either as a certified social worker or licensed master social worker by November 30, 2005 or his employment would be terminated.  (See Pl. Dep. 13, 30-32, 33 (acknowledging that he was required to obtain his state license within one year from date of hire)).

Lewis admitted at his deposition that he signed the document on November 22, 2004.  He testified, however, that the original form had the date "11-30-04" written in and that, at his request, the date was changed to "11-30-05" after he signed the document so that he could have more time to obtain the required license.  In other words, when he signed the document it stated "11-30-04" but, at his request, the "04" was "whited out" and changed to "05."  (See id. at 10-11).  Lewis acknowledged at his deposition that once this change was made, he agreed and understood that his employment could be terminated if he did not provide the documentation by "11-30-05."  (Id. at 13).[3]

### 3.   Lewis's Inability To Obtain A License

Before commencing employment with the Hospital, Lewis had taken the examination to be licensed as a social worker three times -- in January 2002, June 2002, and August 2004 -- and

---

section seventy-seven hundred one of this article."  N.Y. Education Law § 7702(2) (McKinney Supp. 2007); see id. § 7706 (setting forth exemptions).

[3]   In his opposition to the summary judgment motions, although he acknowledges that he signed the form and agreed to the revised document, Lewis contends that "the document was no longer valid once white out had been used."  (Pl. 56.1 ¶ 15).

failed each time.  (Id. at 249-51; UX 12).  While employed at the
Hospital, he took a review course to prepare to take the social
worker licensing examination again, but he withdrew from the
course in May 2005 before completing it.  (Pl. Dep. 35, 121-22,
254-55).  He did not take the social worker exam again and made
no other efforts after the summer of 2005 to take the exam.  (Id.
at 255).  Lewis waited until September 2005 even to inquire of
the Hospital what he should do to "fulfill" his obligation to
obtain a license.  (Id. at 112-13).[4]  Lewis did not obtain his
social worker license by the deadline of November 30, 2005.  (Id.
at 13; see also id. 31-32).

  An individual who has met all the requirements to be a
licensed master social worker except for passing the examination
may obtain a "limited permit" by meeting certain requirements.
(HX 7 at 9-10).  See also N.Y. Education Law § 7705 (McKinney
2004) (requirements for limited permits).  Lewis applied for such
a limited permit, and he was advised by the State Education
Department on October 19, 2005 that his application was
"incomplete" because he had not provided "[p]roof of child abuse
training from an approved provider."  (UX 13; see Pl. Dep. 115-
16).  In fact, Lewis did not have child abuse training from an
approved provider at that time, and he did not obtain that
training until March 30, 2006, two months after his employment at

---

   [4] Lewis testified that he waited until then because he
was "being relentlessly harassed and [he] suffered a diagnosis of
depression during that period of time and it was difficult for
[him] to get the licensing under those conditions."  (Pl. Dep.
113).

the Hospital was terminated.  (Pl. Dep. 116, 119-20; UX 14).
Lewis never obtained a temporary permit.  (Pl. Dep. 7, 40, 116).

### 4.   Lewis's Complaints

On December 7, 2005, Lewis filed a verified complaint
against the Hospital with the New York State Division of Human
Rights (the "State Division").  (HX 11).  Lewis complained that
he was "perceived to be a Muslim" and was subjected to
discrimination because of this.  (Id. ¶ 1).  He complained that
he was "rumored" in his department to be a "child molester" and
that his co-workers thought he was "not an American" and believed
that he was "homophobic" and "racist."  (Id. ¶ 3).  He stated
that the Administrative Director thought he was "Muslim, racist,
homophobic and a child molester."  (Id. ¶ 4).  He stated that his
supervisor, Valerie Holly, was harassing him by not allowing him
to keep doctor's appointments and requiring him to obtain a
doctor's note each time he saw his doctor.  (Id. ¶ 5).  He also
claimed that he was "denied supervision from Ms. Holly for three
weeks."  (Id.).  He made no other mention of Holly.

In his verified complaint, Lewis did not mention any
issue of sexual harassment, but alleged only that: "Based on the
foregoing, I charge respondent with an unlawful discriminatory
practice relating to employment because of creed, in violation of
the New York State Human Rights Law (Executive Law, Article 15),
Section 296."  (Id. at 2 (emphasis added)).

Lewis also charged a violation of Title VII of the
Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., without

alleging any additional purportedly wrongful conduct.  (<u>Id.</u>).
Lewis authorized the State Division to accept the complaint on
behalf of the United States Equal Employment Opportunity
Commission (the "EEOC") as well.  (<u>Id.</u>).

On December 27, 2005, Lewis discussed a number of work
issues with his supervisor, Valerie Holly.  (UX 15).  In an e-
mail written the same day to Holly, Lewis acknowledged that Holly
had noted that there were issues that would have to be addressed
in his "upcoming evaluation."  (<u>Id.</u>).  Lewis made no mention of
any sexual harassment issues.  (<u>Id.</u>).

On January 9, 2006, Lewis sent Holly an e-mail, copying
Union delegate Carole O'Connor and the Hospital's Director of
Social Work, Linda Torres, stating:

> We discussed the four occurances [sic] of
> your person getting close to me where parts
> of your body was [sic] touching mine.  This
> occurred from October 2005 to December 2005.
> We have agreed in order to resolve this
> matter and not let it continue you and I will
> NEVER be in a closed door meeting again
> because I feel violated.

(UX 16; <u>see</u> Carter Decl. ¶ 20).  This January 9, 2006 e-mail was
the first time Lewis had raised the issue of sexual harassment
with anyone.  (Pl. Dep. 198-99, 202).

### 5.  <u>Lewis's Employment Is Terminated</u>

By letter dated January 17, 2006, the Hospital advised
Lewis that his employment was being terminated "effective
immediately" because he had failed to obtain the required New
York State social worker certification within one year of

employment.  (HX 10).  The letter noted that Lewis had recently accused his supervisor of sexual harassment, but concluded that, following an investigation, his allegations were "unfounded and frivolous" and were made "as pretext to maintain [his] position with the Hospital despite [his] lack of certification."  (Id.).

### 6.   Lewis Amends His State Division Charges

In February 2006, approximately a month after his employment with the Hospital was terminated, Lewis asked the State Division to amend his complaint to include a claim of sexual harassment, based on the four alleged occurrences with his supervisor.  (Pl. Dep. 67-71, 85-86, 217-21).  He also raised the issue of retaliation.  (Id. at 86).

### 7.   The Grievance Process

By letter dated January 18, 2006, the Hospital advised the Union that Lewis's employment had been terminated.  (UX 17). By letter dated January 20, 2006, the Union advised the Hospital that it would be grieving the termination of Lewis's employment. (Carter Decl. ¶ 13; UX 20).  The same day, the Union wrote to Lewis advising him that if he believed he had grounds to grieve the termination and wanted to do so, he was to advise the Union in writing.  (Carter Decl. ¶ 13; UX 18).  By letter dated January 27, 2006, Lewis advised the Union that he believed his dismissal was improper and asked to meet with the Union.  (Carter Decl. ¶ 15; UX 19).

On February 21, 2006, a grievance meeting was held pursuant to the CBA's grievance procedure.  (Carter Decl. ¶ 23).

- 9 -

During the meeting, the Hospital presented documentary evidence
to show that Lewis had never obtained the required social work
licensing.  (Id.).  The Union representative attempted to
convince the Hospital to reinstate Lewis despite his lack of
proper licensing.  (Id. ¶ 25).  Lewis's claim of sexual
harassment was raised but the discussion was not completed and
the harassment issue was bifurcated from the licensing issue to
be pursued at another time.  (Id. ¶¶ 23, 24).  During the course
of the meeting, the Union's representative apparently interrupted
Lewis while he was speaking in an effort to keep him focused on
the issue being discussed, i.e., the licensing issue.  (Id. ¶
26).

       By letter dated March 3, 2006, the Hospital advised
that it would not reinstate Lewis because the licensing
requirement was non-negotiable and had to be met "in accordance
with recent changes in the law."  (UX 22; see Carter Decl. ¶ 28).
Therefore, the letter advised, the Hospital was adhering to its
decision to terminate Lewis's employment.  (UX 22).

       The Union thereafter scheduled a meeting for April 4,
2006 to discuss the unresolved part of Lewis's grievance -- his
sexual harassment claim.  (Carter Decl. ¶ 29; UX 23).  On March
9, 2006, however, Lewis advised his Union representative that he
did not want to continue the second part of his grievance.  He
then asked that the grievance be canceled entirely.  The Union
asked Lewis to put his request in writing.  (Carter Decl. ¶ 30).
Lewis did not do so, and the Union representative called Lewis on

April 3, 2006 to discuss the grievance and arbitration procedures.  (Id. ¶ 31).  The Union representative followed with a confirming letter.  (UX 23).

The grievance meeting to address Lewis's sexual harassment claim was re-scheduled to May 18, 2006.  The meeting was held.  The Hospital stated that it had investigated the allegations and found them to be untrue; it stated that the allegations were a pretext created by Lewis to avoid discharge for failing to obtain a license.  The Hospital denied the grievance in its entirety.  (Carter Decl. ¶¶ 34-36).

The Union declined to arbitrate Lewis's grievance because "there was little likelihood of success."  (Id. ¶ 38).  Lewis was advised of the decision and his right to appeal the decision not to arbitrate.  (Id. ¶ 39).  Lewis did not file an appeal, but nonetheless the Union scheduled a meeting of its Health Systems Division Hearings and Appeals Board (the "Board") to consider whether the grievance should be arbitrated.  (Id. ¶ 43).  The Union advised Lewis by letter dated September 27, 2006 that his case would be heard on October 18, 2006 at 6 p.m.  (UX 26).  The hearing was held as scheduled, but Lewis did not appear nor did he give an explanation for his absence.  The Board voted to uphold the Union's decision not to arbitrate the grievance and Lewis was so notified in writing.  (Id. ¶¶ 44, 45; UX 24).

**8.   The State Division's Decision**

On March 13, 2006, the State Division issued its Determination and Order after Investigation.  (HX 15).  The State

Division determined that there was no probable cause to believe that Lewis had been discriminated against.  (Id.).  The State Division noted that the Hospital had terminated Lewis's employment when he had failed to obtain his social worker certification by January 17, 2006.  (Id.).  It concluded that there was "no evidence" to support Lewis's allegations of sexual harassment.  (Id.).  It concluded that the Hospital had shown legitimate, non-discriminatory reasons for its actions, which were not shown to be pretextual.  (Id.).  Accordingly, Lewis's complaint was dismissed.  (Id.).

The State Division advised Lewis that he could appeal to the New York State Supreme Court within sixty days after service of its Determination.  (Id.).  It also advised Lewis that he could seek a review with the EEOC by making a written request for a review with the EEOC within fifteen days of his receipt of the Determination.  (Id.).[5]

### 9.  **Proceedings in the EEOC**

Lewis apparently did seek review from the EEOC.  (Pl. Resp. to Hosp. Mem. at 13).  On May 1, 2006, the EEOC issued a decision dismissing Lewis's charge because it was adopting "the findings of the state or local fair employment practices agency that investigated this charge."  (PX 5).

---

[5]     On June 1, 2006, Lewis sued the State Division in the Supreme Court, New York County, seeking $1 million in damages for breach of contract, negligence, and intentional infliction of emotional distress, based on the State Division's dismissal of his discrimination charge in this case.  (HX 17).

B.   **Prior Proceedings**

Lewis commenced this action against the Hospital and the Union by filing a summons and complaint pro se in the Supreme Court of the State of New York, New York County, on May 31, 2006. (HX 1).  The complaint lays out Lewis's version of the facts and asserts claims for sexual harassment, wrongful termination, breach of contract, and defamation.  (Id.).  At his deposition, Lewis testified that his claims in this case are the same as those asserted in his State Division complaint.  (Pl. Dep. 137).

On June 26, 2006, the Union removed the case to this Court on the basis that Lewis was essentially suing the Union for breach of its duty of fair representation under the CBA, a claim governed by the LMRA.  (UX 9).

The parties conducted extensive discovery.  Plaintiff took twelve depositions himself.  (Rosenthal 2/20/07 Decl. ¶ 4). These motions followed.  Plaintiff submitted lengthy responses to both motions.[6]

## DISCUSSION

I address first Lewis's claims against the Hospital and second his claims against the Union.

_____

[6]     Much of what Lewis submits would be inadmissible at trial.  For example, he submits:  excerpts from books such as Pedagogy of the Oppressed and The Twelve Essential Laws For Becoming Indispensable; his reflections on whether America has changed "post 9/11"; a quote from a 1970s actress; his aspirations when younger to be a news reporter, a singer, and a lawyer; and a sociological study showing that gay men are more likely to use recreational drugs.  (Pl. 4/10/07 Decl. ¶¶ 31, 32, 33, 35 & 37).

**A.   Claims Against the Hospital**

Liberally construed, Lewis's complaint asserts claims against the Hospital for (1) breach of contract, (2) defamation, (3) discrimination, including both "perceived religion" discrimination and sexual harassment, and (4) retaliation.  I discuss each claim in turn.

**1.   Breach of Contract**

No reasonable jury could find on the record before the Court that the Hospital breached any contract with Lewis.

First, any claim that the Hospital breached the CBA is precluded because, as discussed below, the Union did not breach its duty of fair representation to Lewis.  A union's breach of its duty of fair representation is a prerequisite to an employee's claim against his former employer for wrongful discharge in breach of a collective bargaining agreement.  See Young v. United States Postal Serv., 907 F.2d 305, 307 (2d Cir. 1990) ("The threshold issue . . . is whether the district court was correct in holding that the Union had not breached its duty of fair representation to plaintiff.  If we affirm that ruling, that ends the appeal because the Union's breach is a prerequisite to consideration of the merits of plaintiff's claim against her former employer for improper discharge.") (citation omitted).  Hence, Lewis's breach of contract claim against the Hospital is barred.

Second, the Hospital had the right under the CBA to dismiss an employee for cause in any event, and here the Hospital

- 14 -

had good cause to discharge Lewis because he did not obtain the required New York State licensing (or a temporary permit) within one year of hire.  Lewis's obtaining of a social worker license within a year of his hire was an express condition of his continued employment with the Hospital.  Lewis understood this, and he signed the Outstanding New Hire Documentation form acknowledging that his employment could be terminated for cause if he did not obtain the license by November 30, 2005.  (UX 10).  The licensing requirement was referred to in his offer letter (UX 1 ("professional credentialing")), his job description (HX 5), and the vacancy listing (HX 6).  His performance evaluation, which he signed on June 20, 2005, reminded him that he needed to "[a]chieve licensure as a NYS Licensed Master of Social Work by November 29, 2005."  (HX 8 at 8).[7]

Yet, Lewis failed to obtain the license or a temporary permit.  Under these circumstances, a reasonable jury could only conclude that the Hospital discharged Lewis on January 17, 2006, well after the deadline, for good cause.

Third, to the extent that Lewis is somehow claiming that the Hospital breached the CBA or any other contract because his supervisor sexually harassed him, the claim is rejected as a matter of law as well, for the reasons discussed below.

---

[7]    Nor does the fact that the outstanding documentation form was changed from a deadline of "11/30/04" to "11/30/05" provide Lewis with any support.  The change was made for his benefit and, indeed, at his request.  He was obliged to obtain his licensing within a year.

2.  **Defamation**

To recover for slander under New York law, a claimant must prove:  (1) a defamatory statement of fact, that is (2) false, (3) published to a third party, (4) of and concerning the plaintiff, (5) made with the applicable level of fault on the part of the speaker, (6) causing special harm or constituting slander per se, and (7) not protected by privilege.  Albert v. Loksen, 239 F.3d 256, 265-66 (2d Cir. 2001) (citation omitted). Words are actionable only if they are "reasonably susceptible of defamatory meaning."  Qureshi v. St. Barnabas Hosp. Ctr., 430 F. Supp. 2d 279, 28 (S.D.N.Y. 2006) (citation omitted).

Lewis appears to be alleging that he was defamed because he was perceived by co-workers to be a racist, homophobic, a child molester, and a Muslim.  (See HX 11).  His own deposition testimony, however, demonstrates that his defamation claims fail as a matter of law:

> Q    Could you please explain what you mean
>      when you allege defamation of character?
>
> A    Me being perceived as a Muslim.
>
> Q    Anything else?
>
> A    Child molester, homophobic, and racist
>      against white people.
>
> Q    Anything else?
>
> A    No.

(Pl. Dep. 139).

Lewis then explained the basis for each of the claims of defamation, beginning with his assertion that he was defamed

- 16 -

because he was perceived as being racist:

> Q    Let's start with your statement that you
>      believe it was defamatory when you were
>      accused of being racist against white
>      people.
>
>      Who made that accusation against you?
>
> A    Valerie Holly.
>
> Q    When did she make that allegation
>      against you?
>
> A    Throughout the year 2005.
>
> Q    What did she say to you?
>
> A    It's not what she said, it's what she
>      did.
>
> Q    Did she say anything to you -- I'm not
>      talking about what she did, I'm talking
>      about what she said -- did she say
>      anything to you about your being racist
>      against white people?
>
> A    Did she say those words, no.

(Id. at 139-40).  Lewis explained that Holly said or did things

as a "covert" way of waiting to see his response, and that this

somehow defamed him.  The only specific examples he gave were

that Holly waited to see his response when she (1) told him that

another employee had been given a preference because he was white

and (2) she took all of his Caucasian clients off his case load.

(Id. at 140-42).

These are not defamatory statements of fact, nor are

they "of and concerning" the plaintiff.  The first, even coupled

with waiting to see his response, is not a statement about Lewis

but is instead a statement about a co-worker.  Nor is there any

suggestion that the statement was published to a third party,

- 17 -

that is, that it was made to anyone other than Lewis himself.
The second example is not a statement at all and clearly does not
constitute defamation.

As for the allegation that he was defamed because he
was accused of being homophobic, Lewis testified that he could
not remember anyone at the Hospital calling him or referring to
him as being homophobic.  (Id. at 142).  Hence, this allegation
is wholly unsupported and cannot be the basis for a claim of
defamation.

Likewise, Lewis acknowledged at his deposition that no
one at the Hospital accused him of being a child molester, but he
testified that two employees implied that he was a child molester
by referring, in his presence, to Michael Jackson or "some
African man who had molested a child."  (Id. at 144).  He
testified that he was not "an African man."  (Id.).  No
reasonable jury could conclude, however, that comments to Lewis
about Michael Jackson or an "African man" implied that Lewis was
a child molester.  In any event, these are not statements of fact
concerning Lewis, and he does not allege that they were published
to a third party.

Finally, Lewis testified that a co-worker defamed him
by commenting to him that one of his names -- Talmadge -- was the
name of someone associated with Malcolm X:

> Q    Did you think that Ms. Bundy telling you
>      about your name Talmadge was defamatory?
>
> A    I think it was her perception of the
>      name Talmadge being connected with
>      Malcolm X.  Putting me in that category

- 18 -

is defamatory.

Q   How so?

A   Because I'm not connected with Malcolm
    X.  I'm not connected with Muslims.
    Talmadge is not a Muslim name.  I made
    it very clear in '94 when I changed my
    name that I did not want to be
    associated with that religion.

Q   Did Ms. Bundy accuse you of being a
    Muslim?

A   In that instance, yes.

Q   What did she say?

A   She said Talmadge is connected with
    Muslim.

Q   Did anybody ever ask you whether you
    were Muslim?

A   These are implications made all over the
    place, not knowing me at all.

    None of these people know who I am
    but they are making implications
    all over the place, waiting for my
    response, who they think it's an
    African person.

    My own people, it's distressing.

Q   What do you mean, your own people?

A   African-American people coming to me
    with this information.

    It's terrible.

Q   Would it have been okay if it had been
    white people who said this to you?

A   No, it wouldn't.

Q   But it's worse that it's your own people
    as you say?

A   Thank you.  Thank you.

(Id. at 146-47; see also HX 9 (plaintiff's chronology)).

The statement that the name "Talmadge" was somehow connected to Malcolm X is simply not a defamatory statement of fact concerning Lewis, and no reasonable jury could conclude otherwise.  Moreover, no reasonable juror could find that the statement that someone named Talmadge was connected to Malcom X implied that Lewis was Muslim.  Nor could an implication that Lewis was Muslim, in this context, even be defamatory.  Finally, again, Lewis has failed to allege that the statement was published to any third party.

For all these reasons, Lewis's defamation claims fail as a matter of law.

### 3.  Discrimination

To the extent Lewis asserts discrimination (including harassment) claims under New York state law, the claims are barred by the doctrine of election of remedies, for he filed his verified complaint with the State Division, which dismissed the complaint on the merits and not on the grounds of administrative convenience.  As the New York State Executive Law provides:

> Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of appropriate jurisdiction for damages . . . unless such person had filed a complaint hereunder or with any local commission on human rights, . . . provided that, where the division has dismissed such complaint on the grounds of administrative convenience, . . . such person shall maintain all rights to bring suit as if no complaint had been filed with the division.

N.Y. Executive Law § 297(9) (McKinney 2005); see Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 75 (2d Cir. 2000).

Nonetheless, the election of remedies doctrine does not preclude Lewis from pursuing any claims he might have under Title VII.  Although Lewis's complaint in this Court does not cite Title VII, because his verified complaint in the State Division did cite Title VII and because the EEOC considered his claims, I consider his discrimination claims on the merits under Title VII.

At his deposition, Lewis acknowledged that the Hospital did not discriminate against him because of race, gender, religion, or sexual orientation.  (Pl. Dep. 96-97; see also id. 78-80).  Nor did he contend that he had been discriminated against because of any disability.  (Id. at 196).  Rather, he testified only that he was discriminated against because of his "[p]erceived creed" -- the Hospital's "perception" that he was Muslim.  (Id. at 78-79, 97).  Despite the acknowledgment that he was not discriminated against because of his gender, he also alleges a sexual harassment claim based on the four alleged instances of inappropriate touching.  (See id. at 196).  Accordingly, I discuss the "perceived creed" discrimination claim and the sexual harassment claim on the merits.

### a.   Perceived Creed or Religion Discrimination

Lewis's claim that he was discriminated against in violation of Title VII because of his "perceived creed" or "perceived religion" must be dismissed, for at least two reasons.

- 21 -

First, as discussed above, Lewis has not articulated a factual basis for any "perceived religion" claim.  He speculates that a co-worker implied that he was Muslim because she commented to him that someone with the name "Talmadge" had been affiliated with Malcolm X.[8]  But no reasonable jury could conclude that this comment, even if it was made, implied that Lewis was Muslim.  Moreover, even if it did imply that he was Muslim, at worst this would be a stray remark that would not, without more, constitute evidence of discrimination.  See Silver v. North Shore Univ. Hosp., 490 F. Supp. 2d 354, 362-63 (S.D.N.Y. 2007).

Second, the "perceived religion" claim also fails as a matter of law, for the protections of Title VII do not extend to persons who are merely "perceived" to belong to a protected class.  See Uddin v. Universal Avionics Systs. Corp., No. 05 Civ. 1115 (TWT), 2006 WL 1835291, at **5-6 (N.D. Ga. June 30, 2006) ("Title VII does not explicitly protect persons who are perceived to belong to a protected class.") (emphasis in original); Butler v. Potter, 345 F. Supp. 2d 844, 850 (E.D. Tenn. 2004) ("Title VII protects those persons that belong to a protected class, . . . and says nothing about protection of persons who are perceived to belong to a protected class.") (emphasis in original; internal

---

[8]     Lewis also testified at his deposition that a security guard at the Hospital hit him in the shoulder.  He speculated that this happened because the security guard thought he was Muslim, but he acknowledged having no evidence that the security guard perceived him to be Muslim.  (Pl. Dep. 178-80).

Lewis acknowledged at his deposition that his supervisors never made any comments to him about his name or his being Muslim or any perceived creed.  (Id. at 100-01, 108-10).

citation omitted); see also Berrios v. Hampton Bays Union Free Sch. Dist., No. 02 Civ. 3124, 2007 WL 778165, at *1 (E.D.N.Y. Mar. 12, 2007) (noting absence of Supreme Court or circuit court precedent for "perceived religion" claim under Title VII, but deciding to put such claim to jury to permit appellate review). In the Americans with Disabilities Act, Congress provided for claims based on a "perceived" disability or being "regarded as" having a disability. See Uddin, 345 F. Supp. 2d at 850. If Congress had wanted to permit a similar cause of action under Title VII for "perceived religion" discrimination, it could have so provided. It did not.

### b. **Sexual Harassment**

Sexual harassment claims generally fall into two categories: quid pro quo claims, which involve "a threat which is carried out," and hostile environment claims, which involve "offensive conduct in general." Mormol v. Costco Wholesale Corp., 364 F.3d 54, 57 (2d Cir. 2004) (quoting Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 753 (1998)); see also Schiano v. Quality Payroll Systs., Inc., 445 F.3d 597, 603-04 (2d Cir. 2006). Here, Lewis has not asserted a quid pro quo claim, for he has not alleged that he was subjected to any threats, nor has he claimed that he was subjected to adverse employment action because of his refusal to submit to sexual advances. Rather, Lewis complains that he was subjected to four alleged instances of improper physical contact by a supervisor. Hence, I analyze the claim as a hostile environment claim.

### i)   **Applicable Law**

To prevail on a hostile work environment claim under Title VII, "a plaintiff must first show that the harassment was sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Feingold v. New York, 366 F.3d 138, 149 (2d Cir. 2004) (internal quotations and citations omitted); see also Cruz v. Coach Stores, Inc., 202 F.3d 560, 570 (2d Cir. 2000) (to defeat summary judgment motion on hostile environment claim, "plaintiff must produce evidence that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment") (internal quotation marks omitted). Second, a hostile work environment claim under Title VII requires a showing that the conduct occurred because of plaintiff's membership in a protected class. See Brennan v. Metro. Opera Ass'n, 192 F.3d 310, 318 (2d Cir. 1999). If not based on a plaintiff's membership a protected class, abusive conduct in the workplace is not actionable under Title VII. The statute prohibits discrimination based on certain protected classes, and it is not a general code of civility. See Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81 (1998). Finally, the plaintiff must demonstrate that a specific basis exists for imputing the conduct that created the hostile environment to the employer. Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708, 715 (2d Cir. 1996).

The first element has both a subjective and an objective component.  The victim must subjectively perceive the environment to be abusive, but the misconduct must also be sufficiently severe or pervasive to create an objectively hostile or abusive work environment.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993).  To determine whether conduct is objectively severe or pervasive, the court must consider the totality of the circumstances, including factors such as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance."  Id. at 21, 23; see also Patterson v. County of Oneida, 375 F.3d 206, 227 (2d Cir. 2004).  Conduct is not sufficiently severe or pervasive if it does not alter the conditions of employment.  As the Second Circuit has recognized:

> Simple teasing, offhand comments, or isolated
> incidents of offensive conduct (unless
> extremely serious) will not support a claim
> of discriminatory harassment.

Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004).

### ii) **Application**

Summary judgment is granted in favor of the Hospital dismissing Lewis's sexual harassment claim, for two reasons.  First, even assuming the incidents occurred as Lewis alleges, no reasonable jury could find that the misconduct was so severe or pervasive as to be objectively hostile or abusive.  Second, even assuming the conduct was severe or pervasive, Lewis does not

allege that the misconduct was directed at him because of his
gender.

### A.    Severe or Pervasive Conduct

No reasonable jury could find that the alleged
misconduct was sufficiently severe or pervasive, for the
following reasons:

First, Lewis identifies only four incidents over a
three-month period as the basis for his sexual harassment claim:
he alleges that on four occasions during October, November, and
December 2005 his supervisor brushed up against him.  (Pl. Dep.
126-27, 202; HXs 13, 14, 15).  In a written description of the
four incidents, he describes the first incident as
"accidental[]."  (HX 13).  Hence, only three incidents are really
at issue.  He alleges no other instances of unwelcome sexual
contact or conduct.  (See Pl. Dep. 202-03).

Second, the three (or four) alleged incidents were not
objectively severe.  In his e-mail to his supervisor of January
9, 2006, when he first accused her of sexual harassment, he
described the incidents as "your person getting close to me where
parts of your body was [sic] touching mine."  (HX 14).  When he
finally alleged to the State Division that he had been sexually
harassed, he claimed only that his supervisor had "brushed up
against him on four occasions between October 2005 and December
2005."  (HX 15).  He acknowledged at his deposition that this was
a "correct statement" of what he told the State Division.  (Pl.
Dep. 126-27).  He did not allege, either in his e-mail to his

supervisor or his statement to the EEOC, that the supervisor had
rubbed her breast on him.  It was only in his written chronology
of the four incidents that he claimed that the supervisor stood
so close that she "rubbed her breast on me."  (HX 13).  Certainly
under the first interpretation ("brush[ing] up against him"), and
even under the second (standing so close to him that her breast
rubbed against him), the incidents simply were not objectively
severe.

Third, even accepting Lewis's description of his
reaction, his own words show that subjectively he did not find
the conduct to be physically threatening or humiliating.  He
wrote that the contact "seemed and felt strange," and he
expressed puzzlement at why the supervisor got so close to him.
(HX 13).  He wrote that "[t]his woman is a freak" and "[t]his
woman is disgusting," but he did not, in his written chronology
of the four incidents, claim that he suffered any psychological
or emotional impact.  (Id.).  In his January 9, 2006 e-mail
complaining about the four incidents, he did not complain of any
psychological or emotional reaction other than to write that he
would never be in a "closed door meeting" with the supervisor
again "because I feel violated."  (HX 14).

Fourth, no reasonable jury could find that the three or
four incidents of inappropriate conduct could have unreasonably
interfered with Lewis's work performance.  In fact, Lewis did not
even report the alleged sexual harassment until January 9, 2006,
some three weeks after the last of the four incidents.  (Pl. Dep.

198).  He did not mention the subject of sexual harassment at all
in the verified complaint he submitted to the State Division on
December 7, 2005, even though three of the four incidents
allegedly had occurred before then.  (HXs 11, 13).  He complained
in the verified complaint that the supervisor in question had
harassed him by not allowing him to keep doctor's appointments
and requiring him to provide doctor's notes, and yet he did not
mention that she purportedly had sexually harassed him by rubbing
her breast against him.  (HX 11 ¶ 5).  In a nine-page detailed
chronology that he wrote describing numerous incidents during his
employment at the Hospital, he makes no mention of the four
alleged incidents of his supervisor brushing up against him or
rubbing her breast on him, even though he complained about the
same supervisor in many entries not involving physical contact.
(HX 9; see Pl. Dep. 33).[9]  Hence, Lewis's actions show that the
alleged conduct did not have much of an impact on him.

        Finally, Lewis's e-mail shows that the matter had been
resolved to his satisfaction, as he wrote:  "We have agreed in
order to resolve this matter and not let it continue you and I
will NEVER be in a closed door meeting again because I feel

---

        [9]    Rather, inexplicably the four incidents are listed in a
separate chronology, which contains no other entries, even though
entries appear in both documents for all four dates in question.
(HXs 9, 13).

        At his deposition, Lewis also testified that when each
incident happened, he asked Holly what she was doing and "her
response always was, oh, excuse me."  (Pl. Dep. 202).  He never
told her during any of the incidents he believed she was engaging
in sexual harassment.  (Id.).

violated."  (Id.).  The State Division likewise construed the statement as an indication that Lewis believed "the matter was resolved."  (HX 15 at 2).

From these undisputed facts, and in light of the totality of the circumstances -- including Lewis's overreaction to statements of co-workers, including his irrational conclusion that a passing reference to Michael Jackson implied that he was a child molester and that a passing comment that a white employee had been given a preference implied that he was racist, and Lewis's knowledge that his employment was likely to soon be terminated because of his inability to obtain the required social worker's license -- a reasonable jury could only conclude that the three (or four) incidents did not have such an impact on Lewis as to change the conditions of his employment to the extent where objectively there was a hostile work environment.

### B.  Gender Discrimination v. Sexual Conduct

Even assuming there was an objectively hostile or abusive work environment, for Title VII to apply, Lewis must show that the misconduct occurred because of his membership in a protected class.  See Brennan, 192 F.3d at 318.  He has failed to do so.

As Lewis has acknowledged, he is gay and the supervisor in question, a woman, is also gay.  (Pl. Dep. 28-29, 200).  He has not alleged anywhere that the alleged misconduct was directed at him because of his gender, and, to the contrary, he disavowed at his deposition that he had been discriminated against or

- 29 -

harassed because of his gender.  (<u>Id.</u> at 78-80, 96-97).  Even assuming the supervisor brushed up against him and rubbed her breast against him, he does not contend that this happened because of his gender.  He does not allege anywhere -- not in his written description of the four incidents or in his January 9, 2006 e-mail or in his statements to the State Division or in his voluminous submissions to this Court -- that his supervisor was making a sexual advance toward him or that the supervisor brushed up against him because he was a man.  <u>See, e.g.</u>, <u>Simonton v. Runyon</u>, 232 F.3d 33, 36 (2d Cir. 2000) (interpreting <u>Oncale</u> as permitting same-sex harassment claim as long as plaintiff could show that he was harassed "because he was male").[10]  On this record, then, a jury would have to speculate as to the supervisor's motivation -- if any -- in brushing up against Lewis.  A reasonable jury could not find that, more likely than not, the supervisor brushed up against Lewis "because he was male."

Of course, if the incidents were accidental -- if there was no motivation -- they would not be actionable under Title VII.  To the extent Lewis suggests that the supervisor rubbed up against him because of his sexual orientation -- to tease him, perhaps, because of his sexual preferences -- the conduct still

_____

[10]   In a slightly different context, Lewis testified that the supervisor in question yelled and screamed at him because of his perceived religion or creed.  When asked why he believed that, Lewis responded:  "You know, I cannot get in Valerie's mind.  I don't know why she did these things. . . . I really don't know."  (Pl. Dep. 108-09).

would not be actionable under Title VII, for it is well settled that Title VII does not protect against discrimination based on sexual orientation.  See, e.g., id. at 35 ("The law is well-settled in this circuit and in all others to have reached the question that . . . Title VII does not prohibit harassment or discrimination because of sexual orientation.").  Finally, to the extent that Lewis is alleging that the supervisor was intentionally engaging in sexual -- as opposed to gender-based -- conduct, again he cannot find recourse in Title VII, for the statute is not a general bar of sexual conduct.  See Martin v. New York State Dep't of Correctional Servs., 224 F. Supp. 2d 434, 447 (N.D.N.Y. 2002) (granting summary judgment dismissing sexual harassment claim in part because "[t]he name-calling, the lewd conduct and the posting of profane pictures all are of a sexual, not gender, nature"); see also Simonton, 232 F.3d at 36 (holding that, for purposes of Title VII, "'sex' refers to membership in a class delineated by gender").[11]  Indeed, because Lewis has not alleged "a basis for inferring gender-based animus," a reasonable jury would be "unable to infer that the alleged conduct would not have been directed at a woman."  Id. at 37 (affirming dismissal of sexual harassment claim brought by male plaintiff).  Cf.

---

[11]     Of course, conduct can still be repugnant or improper even though it is not prohibited by Title VII.  See Simonton, 232 F.3d at 35 (noting conduct was "morally reprehensible," even though it was not proscribed by Title VII).  Here, the Hospital's sexual harassment policy "prohibits harassment of a gay man by a gay woman," and the policy is enforced "without regard to sexual orientation."  (Ray 5/21/07 Decl. ¶ 3).  Hence, the Hospital's policy provides protections beyond those required by Title VII.

Petrosino, 385 F.3d at 221-23 (holding that hostile work
environment that exposed both men and women to sexually offensive
circumstances could still support hostile environment sexual
harassment claim if circumstances were "more demeaning of women
than men").

Accordingly, Lewis's sexual harassment and
discrimination claims are dismissed.

### 4.   **Retaliation**

Title VII prohibits an employer from firing or
otherwise discriminating against any employee "because he has
made a charge, testified, assisted, or participated in any manner
in an investigation, proceeding, or hearing under [Title VII]."
42 U.S.C. § 2000e-3(a).  Thus, Title VII's "participation clause"
protects participation in a proceeding under Title VII.  See
Deravin v. Kerik, 335 F.3d 195, 203 n.6 (2d Cir. 2003).  Further,
"Title VII is violated when 'a retaliatory motive plays a part in
adverse employment actions toward an employee, whether or not it
was the sole cause.'"  Terry v. Ashcroft, 336 F.3d 128, 140-41
(2d Cir. 2003) (citation omitted).

To establish a prima facie case of retaliation, Lewis
must show that (1) he was engaged in protected activity; (2) the
Hospital was aware of that activity; (3) he suffered an adverse
employment action; and (4) there was a causal connection between
the protected activity and the adverse action.  Id.; accord Jute
v. Hamilton Sundstrand Corp., 420 F.3d 166, 172-73 (2d Cir.
2005).

A plaintiff may present proof of causation either "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or . . . (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. N.Y. City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (citation omitted); see also Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993). Close temporal proximity can be enough to show causation, and the Second Circuit has held sufficient a "mere twelve day" period between complaint and discharge. Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1178 (2d Cir. 1996). On the other hand, close temporary proximity will not salvage a retaliation claim where the facts -- including, for example, where the adverse employment action is initiated before the protected activity occurs -- dispel any notion of retaliation. See, e.g., Griffin v. Ambika Corp., 103 F. Supp. 2d 297, 312-13 (S.D.N.Y. 2006) (suspension two days after complaint to State Division insufficient to establish retaliation where steps toward discipline were taken before complaint); Zeigler v. Marriot Int'l, Inc., No. 03 Civ. 7688 (RWS), 2005 WL 1022431, at *15 (S.D.N.Y. May 2, 2005) (discipline one day after plaintiff filed discrimination charge insufficient where written warnings were issued prior to filing of charge and subsequent discipline was consistent with prior warnings); see also McLee v. Chrysler Corp., 109 F.3d 130, 136 (2d Cir. 1997) (discharge of plaintiff three days after supervisors learned plaintiff had contacted

civil rights lawyer did not create issue of fact as to employer's motive, where plaintiff had been told earlier that he was going to be fired).

Although a plaintiff's burden at the prima facie stage is de minimis, the plaintiff must at least proffer competent evidence of circumstances that would be sufficient to permit a rational finder of fact to infer retaliatory intent.  See Cronin v. Aetna Life Ins. Co., 46 F.3d 196, 204 (2d Cir. 1995).

Once a plaintiff establishes a prima facie case of retaliatory discharge, the burden shifts to the employer to articulate a legitimate, non-retaliatory reason for its employment decision.  Jute, 420 F.3d at 173; Treglia v. Town of Manlius, 313 F.3d 713, 721 (2d Cir. 2002).  If the employer makes this showing, the burden shifts back to the plaintiff to prove that the employer's explanation is pretextual and that the employer intentionally retaliated.  Jute, 420 F.3d at 173; Treglia, 313 F.3d at 721.

Lewis has not proffered competent evidence from which a reasonable jury could find that he was discharged in retaliation for filing his charge of discrimination with the State Division on December 7, 2005 or for sending an e-mail to supervisors on January 9, 2006 complaining of sexual harassment.  Although he has presented evidence to establish the first three elements of his prima facie case, he has not presented sufficient evidence from which a reasonable jury could find a causal link between his protected activity and his discharge.  Indeed, the indisputable

facts show that the Hospital terminated Lewis's employment for a legitimate, non-discriminatory business reason -- he did not obtain the required New York State social worker's license within one year of hire.  A license was required by New York law, and a New York license was explicitly made a condition of his continued employment.  As discussed above, Lewis agreed and clearly understood when he was hired that he would have to obtain the license within a year or the Hospital could terminate his employment for cause.  He failed to obtain that license (or a limited permit) and therefore he could not continue to do the work of a licensed master social worker.

Lewis also has failed to point to any direct evidence of a retaliatory animus.  Indeed, all that he can point to is the circumstantial evidence of the timing and sequence of events -- his employment was terminated about five weeks after he filed his verified complaint with the State Division and about a week after he sent his e-mail complaining of sexual harassment.  In light of all the circumstances, however, including the fact that the licensing issue was raised with Lewis when he was hired -- long before he complained of discrimination to the State Division and well before he sent his e-mail to his supervisors complaining of sexual harassment -- the temporal proximity is not sufficient to permit the retaliation claim to withstand summary judgment.

## B.   Claims Against the Union

Although Lewis does not cite a statutory basis for his claims against the Union, he apparently is asserting a claim for

breach of the duty of fair representation under § 301 of the LMRA, 29 U.S.C. § 185.

In an action under § 301 of the LMRA, a plaintiff must establish both that the employer breached the collective bargaining agreement and that the union breached its duty of fair representation to the union members. White v. White Rose Food, 237 F.3d 174, 178 (2d Cir. 2001); see DelCostello v. Int'l Bhd. of Teamsters, 462 U.S. 151, 164 (1983) ("the two claims are inextricably interdependent").

A union's duty of fair representation obligates it "to represent fairly all employees subject to the collective bargaining agreement." Spellacy v. Airline Pilots Ass'n-Int'l, 156 F.3d 120, 126 (2d Cir. 1998). The duty "derives 'from the union's statutory role as exclusive bargaining agent.'" Agosto v. Corr. Officers Benevolent Ass'n, 107 F. Supp. 2d 294, 303 (S.D.N.Y. 2000) (quoting Air Line Pilots Ass'n, Int'l v. O'Neill, 499 U.S. 65, 74 (1991)).

A breach of the duty of fair representation claim requires a plaintiff first to show that the union failed in at least one of the three components of the duty:  (1) "to serve the interests of all members without hostility or discrimination toward any," (2) "to exercise its discretion with complete good faith and honesty," and (3) "to avoid arbitrary conduct." O'Neill, 499 U.S. at 76 (quoting Vaca v. Sipes, 386 U.S. 171, 177 (1967)).  Second, the plaintiff must show causation, that is, that the union's conduct "'seriously undermine[d] the arbitral

process.'"  <u>Barr v. United Parcel Serv., Inc.</u>, 868 F.2d 36, 43
(2d Cir. 1989) (alteration in original; citations omitted).

Courts have fleshed out the three components of the
duty of fair representation.  The discrimination component refers
to that which is "invidious" or "unlawful."  <u>O'Neill</u>, 499 U.S. at
81.  To show bad faith, there must be "fraud, deceitful action or
dishonest conduct."  <u>Amalgamated Ass'n of St., Elec., Ry. & Motor</u>
<u>Coach Employees v. Lockridge</u>, 403 U.S. 274, 299 (1971).  The
actions of a union "are arbitrary only if, in light of the
factual and legal landscape at the time of the union's actions,
the union's behavior is so far outside a wide range of
reasonableness as to be irrational."  <u>O'Neill</u>, 499 U.S. at 67
(citations omitted).  In the grievance context, "[t]actical
errors are insufficient to show a breach of the duty of fair
representation; even negligence on the union's part does not give
rise to a breach."  <u>Barr</u>, 868 F.2d at 43.  Although "a union may
not arbitrarily ignore a meritorious grievance or process it in
perfunctory fashion," there is no "absolute right to have [a]
grievance taken to arbitration."  <u>Spellacy</u>, 156 F.3d at 128
(citations omitted).

Here, Lewis's claims against the Union are barred
because he cannot show that the Hospital breached the CBA;
indeed, the Court has held as a matter of law above that the
Hospital discharged Lewis for cause -- his failure to obtain the
required New York social worker license within a year.  Hence,
Lewis's claims against the Union are precluded on this basis

- 37 -

alone.  Even assuming, however, that genuine issues of fact exist as to whether the Hospital had cause to terminate Lewis's employment, his claims against the Union fail on the merits as well.

No reasonable factfinder could conclude that the Union breached its duty of fair representation to Lewis.  The Union filed a grievance contesting the termination immediately upon being notified that Lewis had been discharged.  (UXs 2, 20).  The Union promptly scheduled a meeting in accordance with the grievance procedures, met with Lewis to prepare for the meeting, and represented him at the meeting.  (Carter Aff. ¶¶ 13, 16, 23-25; UXs 21, 27; Pl. Dep. 320).  The issues were bifurcated, and the Union represented Lewis at the second grievance meeting as well.  (Carter ¶¶ 24, 29-32).

Moreover, as a practical matter, there was little the Union could do for Lewis, for the Hospital's evidence that it discharged Lewis for cause was overwhelming -- the documents, including documents signed by Lewis, showed that he was hired with the express understanding that he was required to obtain a New York license within a year, and he failed to do so.  Nor could the Union even argue mitigating circumstances, for the November 2005 deadline had been exceeded by many weeks, and the license was required by New York law.  No reasonable factfinder could conclude that any of the Union's actions were unreasonable -- much less invidious, unlawful, fraudulent, dishonest, arbitrary, or irrational.  See Spellacy, 156 F.3d at 128 (union

need not pursue grievance that would be, in its estimation, "fruitless").

Nor can Lewis reasonably argue that the Union breached its duty of fair representation by refusing to take his grievance to arbitration. In light of all the circumstances, there was no reasonable, good faith basis for the Union to take the matter to arbitration. Moreover, Lewis failed to avail himself of the Union's internal procedures to pursue arbitration; he had the right to appeal the Union's decision not to arbitrate, a hearing was held, and he failed to appear for his own hearing. Hence, Lewis did not exhaust his internal remedies, and he has shown no basis for waiving the exhaustion requirement. See Clayton v. Int'l Union, 451 U.S. 679 (1981).

Finally, to the extent that Lewis purports to assert breach of contract, discrimination, or retaliation claims against the Union as well, these claims are all without merit, for the reasons set forth above.

## CONCLUSION

Defendants' motions for summary judgment are granted in all respects. The complaint is dismissed with prejudice and with costs. The Clerk of the Court shall enter judgment accordingly.

SO ORDERED.

Dated:   New York, New York
         August 23, 2007

                                    DENNY CHIN
                                    United States District Judge

- 39 -